Thank you, Your Honor. And again, may it please the Court, Kevin McEwen for the California Parties and the California Attorney General. I'd again like to reserve aspirationally five minutes for rebuttal, and I'll keep my time. This is the Lockyer case back, as the Court knows. And in the Orders on Appeal here, FERC has again, again, directly, contrary to the Court's previous remands, decided that misreporting doesn't matter at all. That's what they've decided here. We have two issues. Issue one is a challenge to FERC's 2016 structuring order after the most recent remand. That market-based rate sales that are not properly reported are still entitled to protections of the Mobile Sierra presumption and the filed rate doctrine. Now, I will just say, I'll stop here and say, we have to separate this case from the case we just argued because in that case, FERC decided that as to TransCanada's contracts, the Mobile Sierra presumption was neither avoided or overcome. So that's the decision that's on appeal here. We just heard that case. But in this case, the issue is whether TransCanada filed compliant quarterly reports. And we also have Hofslund in this case. So there are two respondents. But the decision again is whether, or at least involved in this case, especially on issue one, is whether TransCanada is entitled to the Mobile Sierra presumption because it did not file compliant quarterly reports. We contend under Lockyer's logic, if not Lockyer's holding, that because TransCanada and Hofslund broke the reporting rules, which was decided for the very first time in this case on this record, we now have a factual finding from FERC that TransCanada and Hofslund filed reports that were materially defective. And because our argument is because their rates are not filed rates, they shouldn't be presumed just and reasonable, and they shouldn't be entitled to the Mobile Sierra presumption. That doesn't mean, and we're not arguing, that the finding that they're not filed rates and not entitled to the Mobile Sierra presumption means that they're automatically unjust and unreasonable. We think once that determination is made, once the presumption drops and the filed rate status goes away, what FERC has to do is decide whether the rates charged were just and reasonable. Well, FERC never did that here. So... Well, you argue that FERC erred by focusing narrowly on your nexus theory and failing to address the broader question of whether the companies in fact charged an unjust and unreasonable rate, correct? You're arguing that. And did you plead this broader theory? And did our Harris remand require FERC to address the broader theory? Your Honor, FERC's argument is, as I understand it, that the Harris Lockyer remand required FERC to sort of pin FERC down as to what it could consider on remand. And that, at least in my interpretation of the opinion, didn't do that at all. What it did was say, look, we told you in Lockyer you've got to take these quarterly reports seriously. You didn't. You put up various hurdles in... After the remand in Lockyer, what you did was require that the California parties don't even get to the altar unless they can pass the hub-and-spoke test, which was, you know, step one in Lockyer. You never got to the issue of whether they filed compliant quarterly reports. So we're sending it back to you. We're telling you to honor the mandate of Lockyer. And along with that, one of the things that FERC had done on remand from that the failure to file compliant reports resulted in unjust and unreasonable rates because of some other bad activity on the part of the seller. It was concealed by the failure to file compliant reports. And so the California parties tried to put on various kinds of evidence to prove that because FERC had told us to prove that. And FERC didn't listen to it. And went with this hub-and-spoke test as to the first part of the test that was set out in Lockyer. So the court, when it remanded in Harris-Lockyer, said, look, when it goes back on remand, you've got to listen to what the California party's evidence is on this nexus issue. But that didn't prevent FERC from listening to our argument that the very fact that the reports were noncompliant forfeits the benefit of filed rates and forfeits the benefit of the Mobile Sierra presumption. That's our argument. It's a legal issue. And FERC could have considered it. But what FERC said was, we can't consider it because the court told us on remand to do this thing. Well, they could have done both. And there's no reason why they couldn't have done both. Let me go back to the remand. I realize that you think they could have gone beyond the remand and, as you say, done both. But if they did what was within the scope of the remand, why would that be an error? We're not alleging it was an error, Your Honor. We're alleging two things. Our issue one is this legal issue of just the fact of material noncompliant quarterly reporting forfeits the Mobile Sierra presumption, forfeits the status of filed rates. We think that's what Lockyer says. We understand Lockyer didn't say that specifically. No. Here's what Lockyer said. It was stopped short of establishing that sellers who failed to meet the reporting requirements have automatically charged unlawful prices so as to defeat the Mobile Sierra presumption. Right. And that's your opinion. I kind of remember that, even after all these years. But if Lockyer didn't do that and you're now asking us, in effect, to step in where Lockyer left off, is that what you're asking? Well, I think of it this way, Your Honor. When you use those words in Harris-Lockyer in 2015, the stop short words, I interpret it to mean Lockyer didn't get there. And there's a good reason Lockyer didn't get there. Mobile Sierra wasn't even discussed in Lockyer. But our contention is that the logic of Lockyer, you know, Lockyer says, and I know you know this, but compliant quarterly reports are crucial, integral, essential to FERC's market-based rate scheme. In fact, the whole idea of FERC's market-based rate scheme, FERC got the court on board with market-based rates by saying, hey, you know what? It's not just leading the market to determine these rates. Just the fact that we did a market power test before we gave these utilities market-based rates doesn't mean that we don't monitor. We monitor. We require, after the fact, quarterly reports. And they're very important to us. So that's what FERC told this court in Lockyer. And the court latched onto it and just said, you know, that's true. And so we're not going to find the market-based rate scheme to be unlawful under the FPA. But having said that, we're now looking at what FERC has said about the actual reports they got. And FERC just slapped the wrists of these sellers who filed materially non-compliant reports. That's not good enough. Because, again, in Lockyer's words, if there's no filed rate, if you don't have compliant reports, the words of the court were, pragmatically, there's no filed tariff in place at all. And then if there is a tariff in place, the court went on to say the violation is so egregious that it eviscerates the tariff. So this is the reasoning, the logic of Lockyer. And what we've said is, now that we've, and this is the reason I think about your question, Judge McKeown, this way, is now that we finally have a factual finding, you know, in Lockyer, what we had was FERC observed itself that it had looked at the reports of some big sellers like And they said, you know, these reports are all aggregated, that the information is useless, but we're not going to do anything to the sellers. We're just going to make them file new reports that are more complete. And this court said, but that's not good enough. You know, this is a really important thing. And so, but at that time, TransCanada, you know, they're not mentioned. The court didn't know that TransCanada filed non-compliant reports. The court didn't know that Hafslund didn't file compliant quarterly reports. And so now, on this record, the court knows that. So we've got, we've got the issue teed up. The issue is, if you file materially non-compliant quarterly reports, do you get the benefit of the Mobile Sierra presumption? We say no. Do you get the benefit of filed rates? We say no. What is the The result should be that FERC should determine what the just and reasonable rate is. And our argument is, when FERC does that, it's actually sort of easy at this point. We know what the just and reasonable rate was. It's the mitigated market clearing price. That's clearly true for Hafslund because Hafslund sold in the ISO and PX markets. And so, and let me just digress for a moment on Hafslund. Hafslund's a little confusing because they sold during the summer period and they sold during what we call the refund period from October through June of 2000, 2001. And they already got, we already got refunds from Hafslund. Actually, we didn't get them because they're in a foreign country and they won't pay our, they won't pay our refunds. But that's, that's a different story. But we got refunds from Hafslund or refunds were ordered from Hafslund for the, for the refund period. And also, their, Hafslund was a respondent for the where in MPS Merchant, this court affirmed what FERC did, which was find them liable for false load violations. And so, but what's left are the transactions that were, Hafslund did in the summer that weren't found liable for false load transactions. They fell through the crack. Those transactions fell through the crack. So, if the court agreed with us on this issue, in this case, we'd get the rest of the refunds from Hafslund. The MMCP clearly applies. There's no reason why it wouldn't. FERC refused, FERC almost acknowledged it in its order that, yeah, the MMCP is the right, the right result, but we're not doing it because, well, this is Lockyer and, you know, they, we're not going to do anything about their non-compliant quarterly reports because you didn't prove a nexus to bad acts that they did. So, all right, so that's Hafslund. TransCanada. Our argument on TransCanada on the mitigated market clearing price is that TransCanada sold all of its power that we're talking about here to CSRS at the California, Oregon border for the use of the ISO. TransCanada knew this. They knew why CSRS was buying. CSRS was buying to keep the lights on in California. We have, we have documents that say that, you know, they know that California is facing blackouts. So, TransCanada sells to CSRS. CSRS sells to the ISO. Well, it doesn't really sell. It just transfers the power at CSRS' own cost to the ISO so that the ISO can keep the lights on every hour during this crisis. FERC then mitigated the price that CSRS transferred to the ISO. So, let's just say TransCanada sells to CSRS at $500 a megawatt hour. CSRS transfers it to the ISO at $500 a megawatt hour. FERC said that transaction when CSRS transferred it to the ISO has to be mitigated to whatever the mitigated market clearing price was for that hour, you know, $125 or $200 or whatever it was. It's not like TransCanada wouldn't make a profit. They'd still make a profit in this very power, these exact megawatt hours, the right just and reasonable price is the mitigated market clearing price. Council, can I, before you run out of time, if, what happens if I was to agree that on the first issue about, well, what if I, so on the first issue on the Nexus, if I was to agree that FERC too narrowly sort of took the remand on the Nexus issue and agree with you on that and say that they should have gone further and not narrowly kept it to whether you could have a Nexus. Does that, but do I have to also agree with you on the Mobile Sierra presumption? Do those two things work sort of separately? In other words, you're saying the Mobile Sierra presumption should not apply. Yeah, I mean, I don't have the right, but like, let's say I was, does that, do you have to win on both those issues or if you were to say, no, FERC should have looked beyond the Nexus issue and looked whether or not these were just and reasonable rates, then I think, I'm thinking through this, I think you run into the Mobile Sierra presumption that there's a presumption that they're just and reasonable. What we're saying, Your Honor, is that in that, in this circumstance, because we have proved that TransCanada filed materially non-compliant quarterly reports, they don't get the benefit of the Mobile Sierra presumption. Right, right. So the next step is FERC has to determine what the just and reasonable rate is and we're telling you that it's easy at, you know, 20 years later now, we've, FERC has done all the work to work through the mitigated market clearance. I'm aware of all that, but I'm at the, FERC limited its analysis on the remand to just saying, you have to show us there was a nexus between you not, between you not filing proper reports and any harm, right? And so if we were to say, if we have FERC too narrowly construed our prior order by, by limiting it to just this Nexus issue, I'm trying to figure out how that interplays with your Mobile, like, do you, do you have to win on both of those in order to prevail on the Mobile Sierra, on the, on the fact that the Mobile Sierra presumption doesn't apply and that the Nexus. Well, no, no, Your Honor, we, if we, if we prevail on what I'm calling issue one, the legal issue of whether TransCanada gets the benefit of the Mobile Sierra presumption if it filed, simply because it didn't file compliant quarterly reports. And, and when I say simply, I don't mean simply. I mean, it's a big step as Lockyer says. Because if you went on that, it's like, if you went on that, then the whole Nexus issue is kind of out the window. Exactly. Because they have to do a full rate analysis. Right. But what about the other way around? It's a Nexus issue, but if, if, if you concluded that they too narrowly construed what they were supposed to do on remand in light of our precedent on Nexus, does that, I, I think you have to win on what you're calling the first issue in order, the next, that sort of gets rid of the Nexus issue. I'm trying to figure out what relevance the Nexus issue has in this case. Well, if we lost on the first issue, our contention is that on the, we've proved the Nexus. What I want to get to quickly, though, I mean, because. Well, you're using your time. I understand. What I want to get to quickly is simply that what FERC told you on the Nexus issue is that, you know, they said, they said And our Nexus, our Nexus issue is, I could run through, you know, what we, what we said, but it's at page 24 of our opening brief. We explain what we, how we prove the Nexus. And so let's just put that aside for a moment because FERC put it aside after it, after it disagreed with us that we, you know, met the burden. What FERC said was, you know, it doesn't matter anyway because, and this is a quote from paragraph 98 of FERC's original order ER-43. FERC said, Now, you just need to think about that for a moment because FERC told you the exact opposite in the Lockyer case. In fact, the reason that this court upheld the whole market-based rate scheme that was challenged in the Lockyer case is because FERC told you that compliant quarterly reports would reveal the telltale patterns of manipulation and the indicia of market power. FERC can't have this both ways. I mean, in my mind, they just, they just said, well, and this is now. This is, it's a startling, it's just a startling statement. You know, they, they went through the analysis and they, and they concluded that it is both the administrative law judge and then, and then the commission concluded somehow that even though they had told this court. So we're aware of that. I mean, it's, it's glaring. So we're aware of that. What do we do with that if we think that FERC is right now, is correct now? So if, what if, if it is true, what FERC is saying is, yeah, actually it turns out that those things don't really matter. We can get the information elsewhere. The reports don't really matter that much. I don't think it makes a difference, Your Honor. Well, because you're saying, no, because you're saying we've shown a nexus, but if FERC is right about that, then you can't show a nexus because there's, because the nexus has nothing to do with reports because reports aren't really necessary. Yeah, sure. They told us that before. I'm trying to figure out what we do with that. If what they're, if they're right now, you know, if they've given, if they told us two inconsistent things, but what they told us the first time was wrong, but now what they're telling us is correct, what do we do with that? Well, I think you have to think about how it could be that what they told you the first time was wrong, because this was not a predictive thing when they told it to you in 2003. No, no, I mean, it's, it's not, I don't find their position now to be, I mean, I'm not an expert on this stuff, but I don't find it to be the idea that you could figure out the, whether or not there are problems from other sources isn't, doesn't seem completely non-intuitive to me. It seems like, you know, the idea that we don't need it, we don't need to look at the, so, so let's just assume, we don't want to get into, like, whether it's right or not, but let's assume that they are correct now and that what they said before, and maybe it's not even bad faith on their part. Maybe they just thought that it mattered, but turns out they don't. What do I, what, what do we do with that? If they're correct this time, but they were, you know, the whole, I read the first two decisions, the Lockyer and the Harris two as, as completely relying on, I get your point, it's relying on that, and now, now they come in, FERC comes in and says, yeah, actually, it turns out they don't really matter. Well, I think you have to question what they've said. Yes, we could, we could question it and reach the conclusion that they're lying to us this time, but if I, what I'm asking is, if we can reach the conclusion that they were just lying to us last time, or maybe not even lying. I don't think lying is really the correct characterization either way. Yeah, if, if, if we turn, if it turns out that they're right, I take that back. If we turn out and say, you're saying there's a blatant inconsistency, let's assume that's true, but let's assume that's also true that what they're saying now is true, which would mean that what they're saying then was wrong. It's not a lie, it's just, it's just, what do we do with that? I mean, what do, what do I do with that if I reach that conclusion? I think you have to hold FERC to account. I think you have to make them explain how it could possibly be that what they told you then is, is different now, because the explanation they given, have given you in the orders doesn't make any sense. And FERC has also said in the same orders, this doesn't mean that we don't think these quarterly reports are really important. We do think they're really important. All right, well, I think, I think that we've highlighted the five minutes left. I'll give you a minute for rebuttal. Thank you, Your Honor. Thank you. All right, we'll go to the government. We'll go to FERC now. We can't hear you. I'm coming closer. Can you hear me now? We can now. Yes. Okay, thank you. Good morning. Let me start off on... Do you want to tell us your name just for the record? Yes, I'm sorry. I said it when you couldn't hear me. Beth Pasella for FERC. Okay. Let me, let me start with, of course, quarterly reports matter. This court's made clear and the commission certainly understands that quarterly reports are required and as we argued to the court in Lockyer, that they matter because you need these post filings with a specific transaction rate to finish up the filing of the rate. Rates have to be on file at FERC. So they, of course, they matter. And let me also point out that the quarterly reporting requirements are substantially different today and have been for many years at FERC than they were during, you know, more than 20 years ago during the California energy crisis. So the commission has, in order 2001, in 2002, and in order 768 in 2012, the commission has significantly revised its quarterly reporting requirements. And so they're substantially different today. Well, I guess just jump to the point. We've pointed out the inconsistencies in FERC's position on that because now you tell us compliant report is essentially irrelevant. How do we assess FERC's credibility on this question? That's what Judge Van Dyke was asking appellants. What we had before us here on remand from the court was to find out whether quarterly reporting violations masked indicia of... No, I think you're just, can you just answer my question that you said in the past that compliant reporting, including transition specific data, is essential to ensuring a competitive market of just and reasonable rates. Now you say it's fairly irrelevant. Explain that. Well, let me just start off by saying this is a very specific circumstance where we had specific violations that the commission was looking at, specific types of manipulation. And again, things are very different today. I think the commission recognized that the quarterly reporting requirements weren't sufficient to provide enough help for monitoring. And I think the commission understood that that became a factual matter later. And the commission has rectified that. So, and California understands their own brief talks about the quarterly reporting requirements now are not the same as they were at the time. And this is one of the So in Lockyer, we said that the commission was wrong if it treated these quarterly reports as anything less than essential to an invalid administration of the market-based system. Are you, did FERC now take the position that these quarterly reports that are at issue here are not reflective of the information needed to determine what the appropriate rate should be? No, it's no, your honor. What I'm saying is, and perhaps I'm not understanding the latter part of your question. What I'm saying now, what I've always said, and I argued Lockyer, is that the specific rate be on file. And also because it will help the commission, not definitively fine, but it will help the commission detect indicia of manipulation or market power. That has never changed. It turns out in the facts here, when the commission was faced on remand with having to determine whether there was masking of manipulation or market power due to the violations. And the commission absolutely takes these violations very seriously and found that TransCanada and Hopslin both violated their quarterly reporting requirements. And the commission set three questions to be answered at hearing that were generally applicable on besides the mobile CR questions. And the first one was whether quarterly reporting violations occurred. And the answer to that was yes. The second question is, if so, whether that seller's reporting deficiencies, mask manipulation or accumulation of market power. The third question was, if so, whether this resulted in the seller charging unjust and unreasonable prices. And the commission didn't get to step three here because California had not met its burden to show that seller's reporting deficiencies, mass manipulation or accumulation of market power. That was their burden to show and they didn't show. And it turns out that. Right. So counsel, this is this is let me see if I explain my answer. So at the very beginning, FERC says we're going to allow a different sort of system here, but the system's going to have this back end check. And as I read our first two cases, Lockyer and Harris, we're basically holding the commission to its word that this well, the back end check has to be meaningful. And so you have to check these you have to have these reports in order. So you need to look at the reports. And then they come and then when it comes back, the commission does actually look at the reports. But it concludes based on other information, if I'm understanding correctly, am I right in understanding it correctly? Based on other information, it concludes that the reports weren't masking weren't masking anything here. And so when assuming I understand that correctly, the problem is, is that the is by imposing this strict nexus requirement that the only way you can show something is by looking at the reports. There seems there just seems to be some sort of logical inconsistency between saying the reports are really important. We got the Ninth Circuit to say twice that the reports were important that we should look at. Now we're going to only look at the reports. We're only going to let you make your proof with the reports. But what we as the commission are going to rely on other things to say that the reports aren't that important in this case. And I get the idea that the reports may be important in some cases and less important in other cases. I understand that you might have. But if that's true, then why should the remand have been limited to just having to show this nexus issue? If the commission can look to other stuff, why can't California look to other stuff and try to make its proof that they're unjust and unreasonable? Because you never reach that because you narrowly focused on the you narrowly focused and required a nexus for the thing that you said actually didn't really matter very much this time. I think I'm going to start by answering your question, Your Honor, by pointing out that the directive the directive here was this is a very specific type of proceeding just involving quarterly reporting violations. So the commission was directed to determine whether a just and reasonable price was charged by each seller with specific attention to whether reporting deficiencies, mass manipulation or accumulation of market power. So the commission took that directive seriously and did exactly that. It was it looked at the quarterly reports and it looked at the information in them that wasn't that should have been provided in a confined quarterly report that wasn't provided by Hafslund or TransCanada, whether that mass manipulation or market power by any seller. So the only additional information the commission itself looked at was bid data regarding phantom ancillary services and market power and bid data everyone acknowledges would not have been included in quarterly reports. It was not required in quarterly reports. So the other that to fill in what was supposed to be in a quarterly report, it only looked at bid data regarding false export and excuse me regarding market power and phantom ancillary services because bid data was not at that time required to be in quarterly reports. So I mean if the question is the scope of the the Harris remand, which is you explain it is really to determine whether the reports themselves somehow masked market manipulation. And then the commission determined no, they did not and then stopped there. Is that right? It stopped there because it didn't need to get to the next step of figuring what the just and reasonable rate would be because California had not met its burden to show that these rates weren't just and reasonable. The idea built into Lockyer and Harris was that we think that these are correctly functioning markets and so we're going to allow we're not going to we're going to allow people to operate at the market rate, but we're going to double check that on the rear end to make sure that they're just and reasonable and we'll be able to use these reports to do that. But you but in reality the reality of this system we've got now is that you're not really getting to check whether they're just and reasonable because what you're doing is you've taken our first two cases and you've said all you can do to show that they're unjust and reasonable is you have to rely on these on this missing market information. You've narrowly but that sort of doesn't that somehow ignore FERC's sort of overriding mandate to try to make sure that these are actually just and reasonable rates. I understand the idea of holding them to their burden, but you're holding them to their proof and you're limiting them to this little little slice that they can use. You're not allowing them to prove it more broadly. I think your honor the point I'm not getting across to you clearly and so please let me try is this proceeding was solely about quarterly reporting violations. It wasn't about manipulation, it wasn't about market power, it was about quarterly reporting violations specifically. Manipulation was addressed in other proceedings and market power was addressed in other proceedings. This was about specifically what do you do when you know people have violated their quarterly reporting requirements? Why was it limited to that? Was it limited because my understanding was that it's limited to that and their complaint is that it shouldn't have been just limited to that right? They didn't ask for it to be limited to that correct? You read you read Harris. Go ahead. This is what the court said in Lockyer and Harris that the commission had in Harris in particular what we did the last time what FERC did the last time when it looked at this issue it only looked at market power and whether there was masking of market power through this hub and spoke analysis whether it hid the fact that a seller had now had 20 percent of the market and the court came back and said you can't just look at that you have to look at these other things that California has asked you to look at which is the nexus between quarterly reporting violations and whether they masked manipulation any kind of manipulation of market power again your honor other proceedings have already given refunds for manipulation and market power they just hadn't what was left was the quarterly reports aspect of it and in Lockyer I'll be curious to hear from my understanding is from California is that they they still think there's you know obviously you had the hub and spoke in in the previous that you'd already done and I think they didn't get anything for that did they on the hub and spoke they lost on the on the hub and spoke no but the hub and spoke the hub and spoke analysis your honor was what commission did on remand from Lockyer incorrectly we now understand because we thought that manipulation and this is actually I'm glad you brought this up your honors this might help me illuminate this a little better what the commission thought in on remand of Lockyer was that because it was addressing manipulation in other proceedings it didn't have to think about manipulation regarding quarterly reports and the court came back and said no that's not right you're dealing with manipulation on manipulation's sake you're deciding whether there are manipulation violations and other proceedings but you have not decided whether whether manipulation was masked by quarterly reporting violations this is a very very specific issue here that I don't think anybody disputes that but this is just a quarterly reporting violations proceeding not a manipulation proceeding not a market power proceeding but just a quarterly reporting violations proceeding because the other matters have already been addressed and the commission has already provided refunds so let me let me just step if if your position is correct mobile sierra isn't really relevant here correct if you don't get to you don't get to it we don't get to it that's exactly right okay right so um i understand the california parties they're basically saying well because quarterly reports are very important and we know that these reports are materially wrong that you somehow jump over and say therefore there's a nexus and mobile sierra gets blown up i think that's what they're saying and you're saying that this whole issue of the compliant versus non-compliant reports is limited to whether those reports are masking things that's right and that is and and that's for good reason and if i could spend a minute explaining um why why that's true um of course we have the court's mandate in harris which is this is what i specifically told the commission to do and it's not that we wouldn't have gotten to step three which was figure out what the just and reasonable rate should have been and perhaps for haxland apply the mitigated market clearing price and for um for trans canada i don't know what the commission would have done because it has determined that the mitigated market clearing price is not appropriate and this court has affirmed that the mitigated market clearing price is not appropriate um because there are um substantial differences in the markets i don't know what the commission would do regarding and that was in um that was in the cpuc case that's um cited in in um in the briefing so it's not that we wouldn't get to that and it's not it's not that the commission thought at the time of lock year that the reports with compliant quarterly reports would not show um would not help the commission see indicia of um market power or manipulation the commission of course believed that it turns out here that the facts of the circumstances showed that that was not true so for example for false export um you needed trade dates and delivery hour or hourly price and volume data and then it's uncontested that trade date it's uncontested and unchallenged that um that trade dates and delivery hour were not required at the time now let me just say you're excuse me you're over your time um let me find out if my colleagues have any additional questions we don't so please wrap up in 30 seconds um i i guess i would just ask the court to to look carefully at the commission's brief um and and think about the the matters that california has um here it's pretty voluminous um they did not either raise things to the commission over hearing or didn't raise them in their opening brief and didn't give the commission an opportunity to address those matters okay thank you thank you very much all right so uh trans canada and at all i guess uh mr sun back you have five minutes thank you your honors um let's start with the uh importance of the quarterly reports um what california parties council hasn't told you is after non-deficient fully compliant reports were filed in 2002 they didn't use them to make their case they used all sorts of other materials if this was the rock on which market-based rates would be forged for everyone under all circumstances because it was the sine qua non why didn't the california parties actually use those reports and the data contained in them we've talked a little bit about the commission's representations to this court in earlier iterations of the court i could understand those representations in two ways one is there was a learning curve there was a learning experience trans canada in this case is very small potatoes uh we represent less than uh one percent of the market and you can see that the for instance initial decision noted that at paragraph 67 and 94 uh and in fact the california party's initial brief at page 26 notes that the commission pointed out and relied on the fact that other sellers were too small to exercise market power so um saying as a general matter that quarterly reports were important doesn't isn't undermined uh by the fact that when you get down to this small a proportion of the market the quarterly reports almost by definition are not going to show you anything useful they were filed by sellers not buyers so they were organized by seller and that would have meant you would have had to go through for even the big buyers and aggregate the data from that into a particular buyer uh you could understand what this court had been told so mr sunbeck yes it sounds like your position then is that lockyer and harris were just wrong that the quarterly reports kind of provided that really important check on the on the new on the rule that you could just use market rates and not have to have a guess no no your honor i obviously have done a poor job of expressing my uh argument and i apologize the the court uh laid out very important policy goals and it's your position that you don't have much time so it's my is your position that no it's not wrong as a general matter but for a small fry like yourselves uh it's it's not necessarily as important yes your honor and in any event wouldn't uh be essential to demonstrating the existence or exercise of market power because less than one percent of anything is pretty tenuous in terms of a market power assessment can i can i you know i you you heard me struggling earlier with your opposing counsel but i think maybe um judge mckeown's question to firk um might have i think i i heard this right you can't to get to the um the the second the the um presumption in the case the i'm forgetting the name of it now but the um mobile sierra to get to the mobile sierra presumption you is it correct that that is it your position that they have to the um california parties have to win on the nexus on the nexus issue they don't even get to that if they if they don't win on that first issue and get through that i was trying to figure out the relationship between the two issues as i understand their position they're contending that you have in fact they make the statement if memory serves in their brief that this court has already determined that a deficient quarterly report is in itself such an egregious violation that it requires avoiding uh well that's their position but i think judge van dyke just asked you what your position is if they don't satisfy their burden on nexus is that from your perspective is that the end of the inquiry that that could put an end to it yes you you in your remands uh uh and in the in in uh in particular in the lock your remand um there was a great deal of emphasis on the court's discretion the remand recognized the commission had broadest uh discretion in establishing reporting quiet requirements establishing remedial uh action or violation of reporting requirements and in fact at page 1016 uh the court said FERC may elect not to exercise remedial discretion by requiring refunds so even even if the FERC determined that there was a violation uh it did not need to order refunds and i think you can read this uh order and the id to uh justify that conclusion okay could i just ask one other thing really applies to the other parties as well we talk about a violation like it's a global thing but wouldn't it depend on the violation is or was one would presume that embedded in the grant of discretion back to the commission to determine for instance whether refunds uh were warranted or what other broad remedial authority was appropriate for quote anti-competitive conduct unquote yes that's a long way of saying yes okay it is important i'm sorry i was going around the mountain sometimes yes and no works yes all right you're over time unless my colleagues have additional questions which they do not that will conclude your time and i think i told you i'd give you one minute unless we have additional questions judge mckeown in response to your question about the nature of the violation um what is needed in the quarterly reports is information in disaggregated form that can actually be used and trans canada didn't do that and hopslin didn't do that and so there was a material violation so we don't i say i think if there was simply a error in um a number or uh you know words were misspelled or whatever these are these are not material violations but if you can't use the report for the purpose that it was designed for you've got a material violation and that's what you have here um i i just want to touch well i don't have time so i'm gonna i'm gonna just um ask you about remedy this was firks third opportunity to get this right and and honor the lock your mandate um third time wasn't the charm um i you know we're in baseball season i would say three strikes and you're out and um we're asking the court to direct firk at this point to order refunds from trans canada and hopslin on these transactions uh down to the mitigated market clearing price that doesn't uh you know the mitigated market clearing price the way it works and what's your authority for us to order them to give you what you want as opposed to find error and remand for we your honor this court has been very very patient with is is your authority we're sick of you and stop well that's the colloquial version of it your honor but i think you have an inherent power i think a case would be helpful well i think lock here's the case your honor i think i think you have inherent power to enforce the mandate in firk has has now tried at it's taken three swings at it and it's not there um i think enough is enough all right thank you everyone for your arguments this matter will stand submitted that concludes our calendar for today and we'll be in recess actually until thursday at 9 30. thank you
judges: McKEOWN, CALLAHAN, VANDYKE